21 P.3d 395

**PHILADELPHIA INDEMNITY INSURANCE COMPANY, Plaintiff–Counterdefendant–Appellee.**

v.

**Ana BARERRA, individually and as Personal Representative of the Estate of Melvin Sanchez, deceased; Mario Huerta and Lucia Huerta, husband and wife, individually and as the natural parents of Pedro Huerta, a minor child; Juan Eduardo Quintero–Lopez and Michelle Quintero–Lopez, husband wife, Defendants–Counterclaimants–Appellants.**

No. CV–99–0388–PR.

Supreme Court of Arizona, En Banc.

April 16, 2001.

matter whether the remainder were measured in terms of an area of 3.6 acres or 21.84 acres.

Warner, Angle, Roper & Hallam, P.C., by Charles R. Hallam, Jerome K. Elwell, Phoenix, Attorneys for Plaintiff–Counterdefendant–Appellee.

Goldberg & Osborne, by John E. Osborne, Michael E. Medina, Jr., Tucson, Attorneys for Defendants–Counterclaimants–Appellants.

## OPINION

FELDMAN, Justice.

¶ 1 In this declaratory judgment action, we are asked to review a court of appeals opinion affirming the trial court's grant of summary judgment to Philadelphia Indemnity Insurance Company (Philadelphia). *Philadelphia Indem. Ins. Co. v. Barerra*, 196 Ariz. 391, 998 P.2d 1064 (App.1999). We granted review to determine the validity of a driving-under-the-influence (DUI) exclusion from the insurance coverage obtained as part of a car rental transaction. We have jurisdiction pursuant to Arizona Constitution article 6, § 5.3 and A.R.S. § 12–120.24.

## FACTS AND PROCEDURAL HISTORY

¶ 2 The trial court granted summary judgment in favor of Philadelphia. Therefore, we view the facts in the light most favorable to Petitioners. *Martinez v. Woodmar IV Condominiums Homeowners Ass'n, Inc.*, 189 Ariz. 206, 211, 941 P.2d 218, 223 (1997).

¶ 3 On April 22, 1993, Juan Eduardo Quintero–Lopez rented a car from Value Rent–A–Car (Value) for a one-week period. This rental was one in a series of at least eight weekly leases that Quintero–Lopez had made with Value since late February 1993. As was his habit for all of the previous rentals, Quintero–Lopez purchased both the "Loss Damage Waiver" (LDW) and "Supplemental Liability Insurance" (SLI) optional insurance coverages offered by Value at a rate of $9.95 and $5.95 a day, respectively.[1] This additional insurance, underwritten by Philadelphia, increased the basic minimum liability insurance limits required by A.R.S. § 28–2166.B and provided by Value as part of its rental agreement.

¶ 4 To obtain his rental car, Quintero–Lopez signed the front side of Value's two-sided rental agreement, which on the first page includes boxes where a renter must either decline or accept the LDW and SLI coverages. *See* Appendix A(1). When actually purchasing the optional insurance coverages, however, Quintero–Lopez was asked to both initial and sign a one-page "Optional Services & Equipment" addendum to the rental contract. *See* Appendix B. To help sell the options, Value provided Quintero–Lopez with a colorful, tri-fold brochure titled "Relax You're On a Value Vacation" summarily explaining the SLI coverage he purchased. *See* Appendix C. In response to its own query of "What exactly does supplemental liability insurance cover?" the brochure explains:

> SLI provides you with up to a maximum of $1 million of liability protection. Say you run a red light while driving on unfamiliar roads during your vacation, and hit another car with your rental car. In the event of a lawsuit, SLI covers damage to the other (the claimant's) car, their medical costs, and their personal and property damage up to a maximum $1 million.

The additional SLI coverage issued by Philadelphia and accepted by Quintero–Lopez has policy limits equal to the difference between the $15,000/$30,000 statutory minimum limits provided by Value and $1,000,000.

¶ 5 The next day, Quintero–Lopez was driving the rented vehicle while under the influence of alcohol and was involved in a collision that injured one of his passengers, Pedro Huerta, and killed the other, Melvin Sanchez. Huerta's parents, on behalf of their minor son,[2] and Ana Barerra, Sanchez's mother, individually and on behalf of her son's estate, sued Quintero–Lopez in an at-

---

1. It appears from the record, however, that Quintero–Lopez was given the "Manager's Special" of "Full LDW & SLI" for a rate of $10.95 a day. *See* Appendix A(1).

2. Shortly after the Huertas' personal injury suit was filed on behalf of their minor son, Pedro reached the age of majority and the parties stipulated to adding him to the action in his individual capacity. *See* Stipulation, filed August 7, 1995.

tempt to recover for the injury and death. In that action, a judgment was entered against Quintero–Lopez in which Huerta was awarded $435,000 for injuries and Barerra $270,000 for the wrongful death of Sanchez. Value tendered its limits of $30,000, but Philadelphia denied coverage. Huerta, Barerra, and Quintero–Lopez then entered into a *Morris* agreement in which Quintero–Lopez assigned all of his claims against Philadelphia to Huerta and Barerra.[3]

¶ 6 In June 1995, Philadelphia filed a declaratory action against Ana Barerra, Pedro Huerta, Mario and Lucia Huerta, and Juan and Michelle Quintero–Lopez (Petitioners), seeking a ruling that it was not required to satisfy any judgment arising out of the accident because, according to Philadelphia, Quintero–Lopez voided the additional SLI coverage he purchased from Value by breaching a provision of the rental agreement that prohibited driving under the influence. Petitioners answered and counterclaimed, alleging Philadelphia breached its contract obligations and acted in bad faith. Both sides filed summary judgment motions, with Petitioners claiming the DUI exclusion was unenforceable under the reasonable expectations doctrine and also void as contrary to public policy. Without explanation, the trial court denied Petitioners' motion and granted summary judgment to Philadelphia. Petitioners appealed both rulings, and the court of appeals affirmed, holding that the DUI exclusion from the portion of coverage exceeding the minimum limits required by law was neither void as against public policy, unconscionable, nor against the reasonable expectations of an insured. *Philadelphia,* 196 Ariz. at 393–94 ¶ 7, ¶ 10, 998 P.2d at 1066–67 ¶ 7, ¶ 10.

■ ¶ 7 We hold that the DUI exclusion in the present policy violates the reasonable expectations doctrine of *Darner Motor Sales,*

*Inc. v. Universal Underwriters Insurance Co.,* 140 Ariz. 383, 682 P.2d 388 (1984), *Gordinier v. Aetna Casualty & Surety Co.,* 154 Ariz. 266, 742 P.2d 277 (1987), and *Averett v. Farmers Insurance Co.,* 177 Ariz. 531, 533, 869 P.2d 505, 507 (1994). We therefore vacate the court of appeals' opinion and reverse the trial court's judgment.

## DISCUSSION

### A. Primary or excess coverage

¶ 8 Both parties agree that, unless permitted by statute, exclusionary clauses in basic motor vehicle liability policies are void as against public policy with respect to the minimum coverage requirements set by the Financial Responsibility Act (FRA). A.R.S. § 28–4001 *et seq.; see also* A.R.S. § 28–2166 (requiring car rental companies to provide "public liability insurance" in limits of at least $15,000/$30,000). Exclusionary clauses in policies applicable to coverages in addition to or in excess of the minimum limits required by statute, however, may be valid and enforceable. *Arceneaux v. State Farm Mut. Auto. Ins. Co.,* 113 Ariz. 216, 217–18, 550 P.2d 87, 88–89 (1976).[4] The parties argue over whether Philadelphia's coverage was primary or excess. Petitioners claim that the SLI provided additional primary liability coverage and the DUI exclusion is void because the FRA does not permit such exclusions in primary coverage. Philadelphia asserts that the coverage it provides is excess and the FRA therefore does not apply over the minimum limits, making the DUI exclusion proper and enforceable.

¶ 9 The addendum that Quintero–Lopez initialed and signed to purchase Philadelphia's SLI coverage states that it

increases liability coverage up to $1,000,000 in *primary* liability insurance to protect against third-party liability claims

---

3. *See United Servs. Auto. Ass'n v. Morris,* 154 Ariz. 113, 121, 741 P.2d 246, 254 (1987) (holding that, when an insurer has denied coverage, a settlement agreement between the insured and claimant is not a breach of an insurance contract's cooperation clause if the settlement is fair and reasonable, non-collusive and not fraudulent, and does not bind an insurer to any of the factual stipulations).

4. We accepted review of Petitioners' request that we revisit *Arceneaux,* which holds that coverage in excess of the limits required by the FRA is a matter of contractual arrangements between insurer and insured. Because we dispose of this case under the doctrine of reasonable expectations, we find no reason to reexamine *Arceneaux* 's rationale.

made against the renter and authorized drivers for bodily injury or death and property damage caused by the use of a Value vehicle.

(Emphasis added.) The text of the addendum is somewhat similar to a declarations page and sets forth no exclusions from coverage—it simply directs the customer to "ask your rental sales agent for additional information on provisions and exclusions." Directly above the signature line at the bottom of the one-page addendum, the following sentences appear:

> I have read this addendum and agree to its terms and conditions. If there are any differences between the rental agreement and this addendum, I understand that this *addendum supersedes the rental agreement* and will be controlling.

(Emphasis added.)

¶ 10 While the addendum describes the SLI coverage as an "increase in primary liability insurance," the rental contract is silent on this issue, always referring to SLI as "supplemental liability insurance," without specifying whether Philadelphia's coverage is primary or excess. The brochure describing the additional coverages, however, exacerbates the confusion by, in one part, stating that "supplemental liability insurance is excess automobile liability insurance" while, in a different part, describing SLI as "primary coverage, meaning your [own] auto insurance policy will not be called on to contribute unless the loss exceeds the maximum of $1 million."

¶ 11 These provisions make the issue unclear to us and certainly impenetrable to the average consumer. We doubt that the ordinary car rental customer is informed about

insurance to the degree that such a distinction, if it could be made, would be either important or meaningful. Complicating the issue is the fact that two insurers are involved. According to a Certificate of Self Insurance filed by Value with the Arizona Department of Insurance, Value was self-insuring the $15,000/$30,000 coverage it was required to provide its renters under A.R.S. § 28–2166. *See* ¶ 8, *supra.* Thus, additional coverage was provided by Philadelphia and presented to Value's renters through three documents: the addendum, the brochure, and the rental agreement. As discussed above, the addendum called the coverage "primary," the brochure referred to it as "excess" but then said it was an "increase in primary liability insurance,"[5] and the rental agreement said nothing. It is only when one is able to review the terms of the policy Philadelphia issued to Value that it becomes clear that Philadelphia intended the SLI coverage provided to renters to be excess.[6] Of course, a copy of that policy was not provided to Quintero–Lopez. Regardless, we need not determine what difference, if any, results from resolution of the primary-excess issue because this case is more properly analyzed under the doctrine of reasonable expectations.

## B. Reasonable expectations

¶ 12 Although *Arceneaux* allows "the adoption of contract terms that do not conform to the strict requirements of the financial responsibility laws," its holding "does not necessarily mean, however, that all such terms are automatically valid and enforceable." *Averett,* 177 Ariz. at 533, 869 P.2d at 507 (citations omitted).

---

5. We need not concern ourselves with the difference, if any, between excess insurance and additional insurance provided by an insurer that increases the primary limits provided by another insurer.

6. The brochure's fine print on the bottom of its last page does tell renters that "Value's SLI is underwritten by Philadelphia Indemnity Insurance Company," but nothing in the record suggests how an insured would get a copy of the policy. Indeed, the record contains Philadelphia's policy because its counsel attached it as an exhibit to the complaint it filed to initiate this declaratory judgment action. Neither common

sense nor the record indicates that a copy of Philadelphia's policy was available at Value's Phoenix location. Thus, we seriously doubt that even the most diligent customer wanting to check the true description of the coverage he is purchasing would be able to do so even if, as Value recommends in its addendum, he decided to "ask [his] rental sales agent for additional information on provisions and exclusions." Nor do we think Philadelphia can fairly argue that it expected Value's customers to ask about excess coverage details in the excess policy it issued to Value.

As with any agreement sought to be judicially enforced, the law of contracts must be applied in an attempt to discern and effectuate the parties' intentions. That body of law includes the rule of reasonable expectations.

*Id.* First announced in *Darner,* the doctrine of reasonable expectations relieves a party from "certain clauses of an agreement which he did not negotiate, probably did not read, and probably would not have understood had he read them." *Darner,* 140 Ariz. at 394, 682 P.2d at 399.

¶ 13 Car rental customers buying additional liability insurance would expect to be covered for liability imposed for negligent driving, which, of course, includes driving under the influence. But Philadelphia claims that the terms of Value's rental contract delineating the DUI exclusion are enforceable because the provisions are understandable and conspicuous. Specifically, Philadelphia points out that, on the front page of the rental contract, it is readily apparent that:

[A]ny breach of the rental agreement, specifically any violation of any condition(s), restriction(s), and/or term(s) of the rental agreement, renders all insurance coverage and the loss damage waiver, even if accepted and paid for by lessee, *null and void.*

(Underlining in original.) Technically speaking, of course, this statement is not an exclusion but a broad statement of a condition subsequent. In addition, the statement cannot mean what it says, for other violations of Value's rental agreement, such as failure to return the vehicle on time or returning it with less than the same of amount of fuel as when initially rented, would also ostensibly void insurance coverage. According to the rental contract, misrepresentation, perhaps even an innocent one, would be another basis for forfeiting the renter's additional insurance protections. The notion that such trivial violations of the rental contract would actually void insurance coverage would no doubt be a surprise to renters who purchased optional liability coverage at a premium price. In addition, the rental agreement

states that if a renter fails to lock the vehicle's doors and windows, the renter is exclusively responsible for damage to the vehicle, regardless of whether the renter purchased and paid for additional LDW coverage. Philadelphia counters by arguing that it does not interpret Value's exclusions so broadly that every violation of the rental contract voids insurance protections.[7] It cannot deny, however, that it has the ability to do so if it so chooses.

¶ 14 The provision quoted above is not the only term that Philadelphia refers to in explaining why coverage was denied in this case. To find the provision specifically dealing with DUI, one must look to the back page of Value's rental contract. Not surprisingly, the back page is a mass of fine type printed in a single block. *See* Appendix A(2). Approximately half-way down the page, the following language is found under a heading titled "PROHIBITED USE OF CAR":

I will not use or permit any of the following uses of the car: to carry passengers or property for hire; to tow or push anything; in a race, test or contest; to teach driving; to carry persons outside the passenger compartment; to be loaded beyond its rated capacity or to be driven off the normal roadway. I will not use or permit the car to be used for an illegal purpose such as illegal transportation of persons, drugs or contraband, by anyone under the influence of alcohol or other intoxicants, such as drugs, or taking the car outside the continental United States. If the car is obtained through fraud or misrepresentation or used in violation of this Agreement, I understand that my rental will be terminated and LDW, PAC, no fault and all liability insurance protections are void (unless otherwise prohibited by the laws of the State where I rent the car). In addition to my responsibility for loss of or damage to the car as set forth herein, I may be personally responsible for all damage to the person or property of others, all penalties, fines, forfeitures, liens, recovery

---

7. For instance, Philadelphia agrees that leaving the doors of a rental car unlocked is a violation of the rental agreement but, when pressed at oral argument, conceded that the rental contract may contain certain clauses that would be unenforceable.

and storage costs, including all related legal expenses.

It is only when one reads both the second and third sentences of the paragraph together that the purported DUI exclusion functions to deprive those driving under the influence of all insurance benefits. Perhaps most surprising about the language is that it is found in the "PROHIBITED USE OF CAR" paragraph and not in the seemingly more likely "LIABILITY INSURANCE" paragraph directly below it. Yet Philadelphia claims there is nothing surprising or unclear about the exclusion and directs us to several out-of-state cases purportedly supporting their position, most notably *Hertz Corp. v. Home Insurance Co.*, 14 Cal.App.4th 1071, 18 Cal.Rptr.2d 267 (1993).

¶ 15 In *Hertz*, like the present case, an automobile rental company and its excess insurer filed a declaratory action seeking a finding that the insurer was not obligated to provide coverage for an accident that occurred when the renter was driving while under the influence, in violation of the contract. *Id.*, 18 Cal.Rptr.2d at 269. We find the holding of *Hertz* inapplicable to the present case for several reasons. To begin with, *Hertz* did not recognize the doctrine that Arizona courts have called reasonable expectations. Instead, *Hertz* stated that exclusions in insurance policies must be both "conspicuous" and "phrased in clear language" to be enforceable. *Id.* at 273. The language of the *Hertz* DUI exclusion was objectively conspicuous and clear and both *more conspicuous* and *more clearly worded* than Value's DUI exclusion here. Hertz's DUI clause stated, in pertinent part:

THE CAR MAY NOT BE USED: BY ANYONE UNDER THE INFLUENCE OF ALCOHOL OR OTHER INTOXICANTS, SUCH AS DRUGS; FOR ANY ILLEGAL PURPOSE, SUCH AS ILLEGAL TRANSPORTATION OF PERSONS, DRUGS, OR CONTRABAND....

*Id.* n. 11. This provision was highlighted by its use of all capital letters and set apart by being placed in a separate box, even though placed on the second page of the rental agreement. *Id.* at 269. It was both printed on the rental contract and, most important,

reproduced and displayed at the rental car counter for customer inspection. *Id.* In addition, when the renter elected to purchase the excess coverage, he was not only asked to initial a box on the rental agreement signifying he desired such coverage (as Quintero–Lopez did here), but next to the renter's initials within the excess coverage box was the statement: "You acknowledge reading SUMMARY of coverage." That summary, which was located on the excess policy each customer received, was in a question-and-answer format, with one of the questions in boldface type being "Are there any exclusions under [the excess coverage]? Yes." Then six nonexclusive categories or exclusions were listed, including violation of the rental agreement terms. *Id.* at 270.

¶ 16 The court also found it significant, as do we, that the customer in *Hertz* was advised, immediately below the DUI exclusion provision quoted above, that driving under the influence violates the contract and that such a violation voids "ALL LIABILITY PROTECTION, INCLUDING [the excess coverage]." *Id.* at 273–74. This differs significantly from Value's contract, which explains on the opposite side of the agreement from the prohibited use paragraph that any violation of the contract (without explicitly stating that driving under the influence is a violation) voids insurance coverage (without specifically explaining that the provision has no application to the minimum coverage but only to the optional SLI provided by Philadelphia for an extra charge). Based on these significant factual differences, as well as the difference between Arizona and California insurance law, we do not find the holding of *Hertz* to be persuasive.

¶ 17 Philadelphia further argues that this case does not violate an insured's reasonable expectations because an insured who took the time to check on his rights would understand that driving a Value rental car while under the influence of alcohol is a prohibited use that voids the insurance contract. The court of appeals apparently agreed with Philadelphia's argument stating, "we find that the contract terms here could easily be understood by the average customer checking coverage" and thus, "it was not reasonable for

Quintero–Lopez to expect liability coverage for an accident that occurred while he was under the influence." *Philadelphia*, 196 Ariz. at 395 ¶ 15, 396 ¶ 18, 998 P.2d at 1068 ¶ 15, 1069 ¶ 18.

¶ 18 The court of appeals' holding, however, assumes that the ordinary customer is both in a position to and actually expected to analyze the coverage purchased. We disagree. Given the circumstances of the average car rental transaction, the ordinary customer does not have the ability to check his rights by carefully reading the fine print of the rental contract, together with the separate descriptions of the insurance coverage, before purchasing it.[8] Nor, we believe, does the car rental company expect its ordinary customer to spend fifteen or twenty minutes at the rental desk reading all of the small print and asking for an explanation of the terms involved. Such an observation, of course, "does not set a premium on failure to read." *Darner*, 140 Ariz. at 394, 682 P.2d at 399. Rather, it merely recognizes the reality in which most adhesive contracts are formed between businesses and consumers when both parties are more interested in efficiency than in negotiating and reaching mutual agreement over multiple contractual terms. Thus, an exclusion that subtracts from coverage usually provided by insurance should be stated in a conspicuous typeface and placed either on the face of the rental contract or in obvious documentation that would clearly put the renter on notice, prior to obtaining the vehicle, that the policy purchased to cover liability for negligent driving does not cover all types of negligent driving.[9] To place exclusionary language in fine print on the reverse side of a car rental agreement, with nothing else being said, is simply insufficient when the contract is one of adhesion and the transaction one in which speed and efficiency are dominant, as in the instant case. As we have previously held, limitations or exclusions that subtract from what would reasonably be expected "must be *intended and agreed to,* not merely imposed upon an unwitting customer." *Averett,* 177 Ariz. at 534, 869 P.2d at 508.

¶ 19 A close look at Value's purported DUI exclusion (which states that insurance coverage is voided when a rental car is used by "anyone under the influence of alcohol or other intoxicants, such as drugs") demonstrates how enforcement of even these enumerated terms, if unexpected and unreasonable, can be oppressive. Value's DUI exclusion is a strict clause that potentially could be interpreted to exclude not only those renters who drive while intoxicated but also those who, to use the language of Arizona's DUI statute, are under the influence because they are "impaired to the slightest degree." A.R.S. § 28–1381.-A.1. And because Value's exclusionary clause includes "other intoxicants, such as drugs," Philadelphia could hypothetically escape liability for injuries suffered by a claimant involved in an accident caused by a Value renter who had ingested something as innocuous as cough or cold medication. The absurdity of this hypothetical merely demonstrates the unreasonableness of the exclusion from which it arises.[10]

¶ 20 Finally, Philadelphia asserts that because the provisions here are unambiguous, we need only analyze whether the present case is akin to one of the four situations enumerated in *Gordinier,* 154 Ariz. at 272–

8. Any attempt to do so in the present case would have led Quintero–Lopez into the confusion of reading three separate instruments (and perhaps the Philadelphia policy—which was apparently not even available to him) before concluding that driving under the influence would void Philadelphia's SLI coverage but not Value's underlying coverage.

9. Value already clearly notifies its renters of some of its more surprising contract terms relating to insurance. For example, printed in a bold, all-capital-letters typeface on the front side of Value's rental agreement, just above the customer's signature line, is the following language:

LDW (LOSS DAMAGE WAIVER) IS NOT INSURANCE
LESSOR DOES NOT PROVIDE UNINSURED MOTORIST COVERAGE

10. Petitioners argue that exclusions, such as the DUI provision here, that limit coverage for negligent driving should be held void as against public policy. *See Hertz Corp. v. Garrott,* 238 Ill. App.3d 231, 179 Ill.Dec. 387, 606 N.E.2d 219, 222 (1992). Given the grounds of our disposition, we need not reach this issue.

73, 742 P.2d at 283–84. In *Gordinier,* we confirmed that the *Darner* methodology applies to a limited number of cases in which the boilerplate contract clauses are unambiguous but still operate oppressively. *Id.* Specifically, those situations are:

1. Where the contract terms, although not ambiguous to the court, cannot be understood by the reasonably intelligent consumer who might check on his or her rights, the court will interpret them in light of the objective, reasonable expectations of the average insured;

2. Where the insured did not receive full and adequate notice of the term in question, and the provision is either unusual or unexpected, or one that emasculates apparent coverage;

3. Where some activity which can be reasonably attributed to the insurer would create an objective impression of coverage in the mind of a reasonable insured;

4. Where some activity reasonably attributable to the insurer has induced a particular insured reasonably to believe that he has coverage, although such coverage is expressly and unambiguously denied by the policy.

*Id.* (citations omitted).

¶ 21 Arguably, several of the *Gordinier* situations apply to this case. No doubt judges and lawyers are able to read and understand some of the contract terms and insurance exclusions with a minimum of confusion. However, as discussed in ¶ 18, we do not believe a reasonably intelligent consumer would be as successful, especially given the reality of the car rental business. In addition, we do not find that boilerplate language located in different parts of several documents gives a renter purchasing relatively expensive increased liability limits sufficient notice that the additional insurance for negligent driving does not cover *all* negligent driving. The present contract is a standardized form that, because of the nature of the industry, customers have no power to negotiate and will not be expected to read in full. Indeed, such boilerplate language lends itself to provisions that neither customer nor salesperson may be aware of and that may actually be contrary to the expressed purpose of the transaction.

When an exclusion, limitation or escape clause runs contrary to what a reasonable insured would expect, or when it significantly diminishes coverage that the policy purports on its face to provide, the surrounding facts and circumstances must be considered to determine whether, and to what extent, there was a meeting of the minds between the contracting parties.

*Averett,* 177 Ariz. at 534, 869 P.2d at 508. There was no meeting of the minds in this case—Quintero-Lopez intended to purchase liability insurance with limits up to $1,000,000 "to protect against third-party liability claims made against [him] for bodily injury or death ... caused by the use of a Value vehicle," and Value intended to void coverage upon "any breach of the rental agreement." In addition, a term that, without clear warning, eliminates a dominant purpose of the transaction defies reasonable expectations. *Darner,* 140 Ariz. at 392, 682 P.2d at 397. There is no clear warning in this case—exactly how the DUI exclusion actually operates to void coverage can only be understood when one reads all of the several clauses referred to in separate parts of three different documents plus an insurance contract to which the renter is not even a party. Like the *Gordinier* court, even if the provisions may be unambiguous taken alone, "we considerably doubt that the average customer attempting to check on his or her rights could readily understand them. The limitation was inconspicuous and scattered over the policy." *Gordinier,* 154 Ariz. at 273, 742 P.2d at 284. As in a previous case, we find the so-called exclusion unenforceable here "because of its technical wording and inconspicuous location within the policy boilerplate, and because it guts the coverage ostensibly granted...." *State Farm Mut. Auto. Ins. Co. v. Dimmer,* 160 Ariz. 453, 462, 773 P.2d 1012, 1021 (App. 1988) (holding that a household exclusion limiting liability coverage to statutory minimum for injuries to family members of insured residing in insured's household was unenforceable against insured husband and injured wife under doctrine of reasonable expectations).

¶ 22 The third and fourth *Gordinier* circumstances also apply. On April 7, 1993, approximately two weeks before the rental at issue here, Quintero–Lopez was in a previous accident while driving a Value rental car. In addition to being cited for excess speed, Quintero–Lopez was also arrested for driving under the influence. According to Value's accident report, Value was aware of the incident on April 8, but rented to Quintero–Lopez twice more before the current DUI-related accident. Although Value was aware of Quintero–Lopez's previous accident while drinking—a circumstance that would, according to the rental contract, void both the SLI and LDW protections he separately purchased—Value failed to notify Quintero–Lopez that both the damage to the vehicle and any additional liability to a third party were possibly excluded because of his pending DUI charge. Instead, Value continued to sell its additional insurance coverage to Quintero–Lopez. Such activity on the part of Value would undoubtedly "create an objective impression of coverage in the mind of a reasonable insured." *Id.* at 273, 742 P.2d at 284.

¶ 23 Regardless of ambiguity, or even a complete lack thereof, this case is an example of one of the "limited variety of situations" in which Arizona courts will not enforce boilerplate terms in standardized insurance contracts. *Averett,* 177 Ariz. at 533, 869 P.2d at 507. We have examined the several documents that provided Quintero–Lopez with information about the additional insurance coverage he purchased. Such an examination is "generally fact specific," involving an analysis of the "format and clarity of the policy as well as the circumstances surrounding" its acquisition. *State Farm Mut. Auto. Ins. Co. v. Falness,* 178 Ariz. 281, 282, 872 P.2d 1233, 1234 (1994) (explaining on certified question from Ninth Circuit that under some circumstances, rule of reasonable expectations may render named insured exclusion unenforceable). The facts here are not in dispute, and we are able to make our decision today as a matter of law. *See State Farm Mut. Auto. Ins. Co. v. Falness,* 39 F.3d 966, 968 (9th Cir.1994) (holding, as a matter of law, a named insured exclusion unenforceable under reasonable expectations because it lessened coverage the ordinary consumer would have expected); *Dimmer,* 160 Ariz. at 462, 773 P.2d at 1021.

¶ 24 We hold that, under *Darner* and its progeny, the insurance exclusion provisions of Value's rental agreement were contrary to the ordinary customer's reasonable expectations. The basis of this decision makes it unnecessary to consider whether any and all DUI exclusions are unconscionable. *See ante* n. 10. In a contract of adhesion like the present one, to be procedurally enforceable, exclusions that lessen the protection sought as the primary purpose of the transaction must be called to the customer's attention, conspicuously placed, and written in plainly-stated and readily-identifiable language so they can be easily noticed and comprehended under the circumstances in which such transactions take place.

## CONCLUSION

¶ 25 For the foregoing reasons, we vacate the court of appeals' opinion, reverse the trial court's summary judgment for Philadelphia, and remand with instructions to enter judgment in favor of Petitioners on their claim that the so-called DUI exclusion cannot be enforced in this case.

CONCURRING: THOMAS A. ZLAKET, Chief Justice, CHARLES E. JONES, Vice Chief Justice, FREDERICK J. MARTONE, Justice, RUTH V. McGREGOR, Justice.

## APPENDIX A(1)

**Value Rent-A-Car**

RENTAL AGREEMENT NO. PHO21813

PHOENIX, AZ
(602) 273-0190

| | |
|---|---|
| LESSEE (NUMBER ONE) | LOPEZ JUAN |
| BIRTHDATE | 2/02/65 |
| HOME ADDRESS | 1736 E VIRGINIA |
| CITY | PHOENIX |
| ST | AZ |
| ZIP CODE | 85006 |
| DRIVER'S LICENSE NUMBER | 600300615 |
| ST | AZ |
| EXPIRATION DATE | 02/02/94 |

INSURANCE COMPANY & POLICY NUMBER: GRAND CANYON

HOME PHONE (602) 234-0117  LOCAL PHONE (602) 268-5189

4750 5012 9902 2468
05/94 CV
VAN E LOPEZ

AUTH AMOUNT 325.00

**LDW (LOSS DAMAGE WAIVER) IS NOT INSURANCE**
**LESSOR DOES NOT PROVIDE UNINSURED MOTORIST COVERAGE**

X Juan

**MANAGER'S SPECIAL**

$ / day $160.95 / week

x 10.95 for full LDW + SLT

**LDW (LOSS DAMAGE WAIVER) IS NOT INSURANCE**
**LESSOR DOES NOT PROVIDE UNINSURED MOTORIST COVERAGE**

X

| RENT DATE | SHIFT | CHECK IN DGR | SHIFT | ACCOUNT | |
|---|---|---|---|---|---|
| 04/22/93 | 3 | | | PHO21813 | |

GAS CHANGE

SALES-TAX

TOTAL CHARGES

TOTAL CASH DEPOSIT

VOUCHER VALUE

CASH REFUND

BALANCE DUE

MUST RETURN CAR BY 16:44 TO AVOID HOURLY CHARGE
2.20 CHARGE/GALLON IF RETURNED WITH LESS GAS

**FOR RESERVATIONS:**
800-GO-VALUE OR 800-327-2501

LESSOR SHALL PROVIDE AUTOMOBILE LIABILITY INSURANCE WITH LIMITS OF COVERAGE EQUAL TO STATUTORY REQUIREMENTS FINANCIAL RESPONSIBILITY FOR THE STATE OF RENTAL AND LESSEE AGREES TO BE BOUND BY THE CONDITIONS, RESTRICTIONS, TERMS OF SAID COVERAGE. HOWEVER, IF LESSEE IS COVERED BY ANY OTHER INSURANCE, THE COVERAGE PROVIDED BY LESSOR SHALL BE EXCESS COVERAGE.

# APPENDIX A(2)

# APPENDIX B

## OPTIONAL SERVICES & EQUIPMENT ADDENDUM

CUSTOMER NAME: _____     RENTAL AGREEMENT #: _____

**FULL LOSS DAMAGE WAIVER (LDW)***          CUSTOMER'S INITIALS: _____
@ $9.95/day or portion of a day covers any amount of loss or damage to our Rental Vehicle. The customer is not responsible for any loss or damage repairs to our vehicle. The full LDW option covers the customer for comprehensive losses such as accidental fire, theft, vandalism, and for loss or damage as a result of an accident, collision, or act-of-nature.

**PARTIAL LOSS DAMAGE WAIVER (LDW)***        CUSTOMER'S INITIALS: _____
@ $6.95/day or portion of a day covers the first three thousand dollars ($3,000.00) of loss or damage to our Rental Vehicle. This LDW option covers the customer for comprehensive losses such as accidental fire, theft, vandalism, and for loss or damage to our vehicle as a result of an accident, collision, or act-of-nature. The customer is fully responsible for any loss or damage repairs which exceed $3,000.00.

**PARTIAL LOSS DAMAGE WAIVER (LDW)***        CUSTOMER'S INITIALS: _____
@ $4.95/day or portion of a day covers the first five hundred dollars ($500.00) of loss or damage to our Rental Vehicle. This LDW option covers the customer for comprehensive losses such as accidental fire, theft, vandalism, and for loss or damage to our vehicle as a result of an accident, collision, or act-of-nature. The customer is fully responsible for any loss or damage repairs which exceed $500.00.

*CUSTOMER DECLINES THE LOSS DAMAGE WAIVER (LDW)**       CUSTOMER'S INITIALS: _____
Customer is responsible for any and all loss or damage to the Rental Vehicle, up to the full value of the vehicle. I understand that payment on my return of a stolen or damaged vehicle is my direct responsibility.

**SUPPLEMENTAL LIABILITY INSURANCE (SLI)***        CUSTOMER'S INITIALS: _____
@ $5.95/day or portion of a day increases liability coverage up to $1,000,000.00 in primary liability insurance to protect against third-party liability claims made against the renter and authorized drivers for bodily injury or death and property damage caused by the use of a Value vehicle.

**PERSONAL ACCIDENT AND EFFECTS PROTECTION (PAEP)***        CUSTOMER'S INITIALS: _____
@ $3.95/day or portion of a day provides a combined package of personal accident and personal effects protection. PAEP provides a $750.00 *medical benefit* to the renter and passengers in the event of an accident involving the Value vehicle. It also provides an *accidental death benefit* of $15,000.00 for the renter and $5,000.00 to any passenger in the car (payable to the decedent's estate) PAEP also protects the *personal belongings* of the renter and immediate family members traveling with the renter in the event of theft up to $500.00 per occurrence or $1,000.00 maximum per rental.

* ASK YOUR RENTAL SALES AGENT FOR ADDITIONAL INFORMATION ON PROVISIONS AND EXCLUSIONS

## EXTRA EQUIPMENT

Type of Equipment.  1._____     CUSTOMER'S INITIALS:  _____
                    2._____     CUSTOMER'S INITIALS:  _____
                    3._____     CUSTOMER'S INITIALS:  _____

*This is an agreement between you and Value Rent-A-Car to rent equipment at the rate of $_____ per day. The total charges due for renting the equipment will be included in the total charges on the Rental Agreement. This equipment is delivered to you, and accepted by you in good condition, and by this agreement you agree to return the equipment in the same condition to the Value Rent-A-Car location at the place and on the date specified on the above numbered Rental Agreement. You further agree that should you fail to return the equipment because it is lost or stolen or if you return it in a condition which renders it unusable, you will pay $_____ to Value Rent-A-Car as a measure of Value's Loss or Damage. Value is not responsible for any injuries arising as a result of the installation and/or use of this equipment.*

I have read this addendum and agree to its terms and conditions. If there are any differences between the rental agreement and this addendum, I understand that this addendum supersedes the rental agreement and will be controlling.

RENTER'S SIGNATURE _____     VALUE REPRESENTATIVE_____

11/92

## APPENDIX C

*Welcome to what we at Value hope will be a great vacation, full of blue skies, clear roads and memorable moments. To make sure all your memories are happy ones, take extra safety precautions while you're on the road. Wear your seat belts, and place small children in child restraint seats. And spend a few moments discussing optional products with your Value rental agent. Asking a few questions now will ensure that nothing can happen to darken your sunny vacation skies.*

### PROTECT YOUR RENTAL CAR. LDW

Of course you intend to return your rental car in as good condition as you received it. But accidents happen—a fender bender, a more serious accident, even a dent while your car is parked. Think of Value's full Loss Damage Waiver as the ability to say "goodbye" to financial responsibility if your rental car is lost, stolen or damaged, as long as you comply with the terms and conditions of the rental agreement.

### PROTECT YOURSELF AGAINST LAWSUITS. SLI

Supplemental Liability Insurance is Excess Automobile Liability Insurance. In other words, if accepted, it increases the limits provided in the rental agreement up to a maximum of $1 million if you are at fault for an accident involving your rental car and the other party files a lawsuit against you.

### PROTECT YOURSELF, YOUR FAMILY AND PASSENGERS. PAEP

In case of an accident, everyone riding in a Value Rent-A-Car is eligible for medical and accidental death benefits when you've chosen Value's Personal Accident & Effects Protection. In addition, the personal belongings you and your family are traveling with are covered for up to 24 hours a day, as long as you are renting your car, whether the items are in the car, in your hotel room, or elsewhere.

* SLI exclusions:
  • Violation of terms of Rental Agreement.
  • Obtaining a rental car by fraud or misrepresentation
  • Excludes personal injury or property damage to the renter or authorized renters or any member of your family or the driver's family.
  • No protection for uninsured motorists, underinsured motorists, no fault and other supplemental or optional protection or insurance

* PAEP protection excludes:
  • Motorized vehicles and their equipment
  • Animals
  • Currency, coins, stamps, tickets, deeds, securities
  • Delay or loss of income or profit and indirect or consequential losses of any kind.
  • Breakage of glass, unless it coincides with another claim that is insured by the policy.
  • Theft of property while in the care, custody or control of another party.

**Value**
YOUR VACATION CAR COMPANY
1-800-GO-VALUE

*Value SLI and PAEP are written by Philadelphia Indemnity Insurance Company*

## APPENDIX C

**WHAT'S THE DEDUCTIBLE?**

There is no deductible with Value's SLI.

**P A E P**

**PAEP—WHAT'S THAT?**

**Basically, Personal Accident & Effects Protection** provides medical and accidental death benefits when you are in an automobile accident involving your Value vehicle. It also provides reimbursement for certain personal belongings, in the event of theft, while you are renting from Value.

Each occupant of the car, including the renter, can receive up to $750 in medical expense benefits. PAEP offers accidental death benefits of $15,000 to the renter, and $5,000 to any passenger in the car (payable to the decedent's estate). In addition, personal belongings are covered for theft up to $500 per occurrence ($1,000 maximum per rental) as long as you file a police report and show proof of loss.

**WHAT KINDS OF POSSESSIONS ARE PROTECTED?**

As Your Vacation Car Company, Value protects what you and your family are most likely to vacation with: luggage and its contents, camera and video equipment, portable phone, personal electronics, sporting equipment, even your purse.**

**LIFE INSURANCE AND HOMEOWNER'S INSURANCE, DO I NEED MORE?**

PAEP may provide a duplication of coverage already furnished by a personal insurance policy. Benefits under PAEP will pay first, even before you file a claim with your own insurance company. This could even cover your deductible, and avoid an increase to your premium. Why not have a hassle-free vacation?

**WHAT EXACTLY DOES SUPPLEMENTAL LIABILITY INSURANCE COVER?**

SLI provides you with up to a maximum of $1 million of liability protection. Say you run a red light while driving on unfamiliar roads during your vacation, and hit another car with your rental car. In the event of a lawsuit, SLI covers damage to the other (the claimant's) car, their medical costs, and their personal and property damage up to a maximum $1 million.

**WHO DOES SLI COVER?**

SLI offers liability protection to the person who signed the rental agreement and any authorized drivers of the car.

**DOESN'T MY AUTO INSURANCE AND CREDIT CARD DO THE SAME THING?**

SLI is primary coverage, meaning your auto insurance policy will not be called on to contribute unless the loss exceeds the maximum of $1 million. A rental car may not be covered at all, or perhaps only when it is used as a replacement car for your own out-of-service vehicle. Credit cards provide no liability coverage.

**L D W**

**WHY DO I NEED LDW?**

When you rent a car, you are responsible for it. LDW waives this responsibility based on the amount you elect to be protected for. Tires, glass, theft and acts of nature are often excluded in the LDW of other car rental companies. Value waives all or part of your responsibility if you purchase one of our LDW options.

**WHAT ARE MY OPTIONS?**

**Full Loss Damage Waiver**—With this option you're covered up to the full value of the vehicle. If you have an accident, you don't have to file a claim with your insurance company or wait for reimbursement. Choose Value's Full Loss Damage Waiver and simply walk away in the event of loss or damage to the vehicle. No unexpected costs, no hassles—just a carefree vacation, as long as you comply with the terms and conditions of the rental agreement.

**Partial Loss Damage Waiver** (covers up to the first $3000 of damage to the Value vehicle)—This is a popular choice for many Value customers because it covers the most common types of accidents and mishaps, like fender benders.

**Partial Loss Damage Waiver** (covers up to the first $500 of damage to the Value vehicle)—This may be a good practice for renters whose personal auto insurance covers rental cars. In the event of an accident, your $500 LDW can apply to your deductible. In case of minor damage, you don't have to deal with your insurance company at all.

**HOW DOES AUTO INSURANCE AND CREDIT CARD COVER?**

Every policy offers different coverage. A rental car may not be covered at all, or perhaps only when it is used as a replacement car for your own out-of-service vehicle. There may be deductibles, policy limits or exclusions in your policy. And if you file a claim against your insurance, that often means a premium increase. Check with your insurance representative for more information. It may be to your benefit to choose Value LDW—and is Value carefree vacation.

Some credit cards do offer coverage. However, this is usually secondary. Credit cards have many other limitations, including type of car and length of rental. So check with your credit card company.